morning and it is Smith versus Finkley and Stahl. All right we have Ms. Lappin and we have Mr. Stern. All right you may proceed Ms. Lappin. Oh thank you Your Honor. Good morning and may it please the court. This particular case presents a set of unique facts. The facts present a tense, uncertain, rapidly evolving set of circumstances that we believe was anticipated by the Supreme Court in the In this instance we had two Milwaukee officers who were on duty. They responded to a call for service. Milwaukee citizens reported men threatening them with guns. Uh apparently there had been some kind of altercation, a physical altercation and violence earlier in the day and two guys returned with guns. Initial responding officers were on bicycle patrol. They made observations of these gentlemen. They attempted to engage in a field interview and Mr. Smith ran from them and the officers observed what appeared to be a gun in his pocket being held by his left hand as he ran. It's not disputed that Mr. Smith ran from the police. He hid from the police. When the two initial responding officers found him hiding on a rooftop nearby, he failed to abide by their commands and orders to surrender. Ultimately within a few minutes, he and Stahl appeared at the rooftop. They had information wherein they believe that this gentleman either had a gun on his person or hidden somewhere on the rooftop. He had been hiding behind this air conditioning unit. Again, we had officers ordering him to surrender. Specifically, Officer Stahl very strongly ordered him to put his hands in the air and turn around rather than abide by that order. Mr. If I could jump in for a moment here as I reviewed the video evidence several times over, there were commands made by the originally responding officers, the two bicycle cops who were following him. And so he, he meaning Mr. Smith was resisting arrest for at least a minute or two before these two officers got to the scene. I didn't actually time it, but it seemed to be like at least a minute or two before these two officers arrived at the scene that Mr. Smith was on the roof pacing around. Well, first of all, hiding behind the air conditioner unit. And then when they spotted him, they gave him the two original bicycle cops gave him many correct. And even on Officer Stahl's body camera video, which is the one that has the audio as he's approaching, you can hear other officers down the alley saying, dude, you're surrounded, you know, give up or something of that nature. You can hear the other officers giving those commands as Officer Stahl and Officer Finkley are running toward the garage and running up the stairs and so forth. Um, and so all of this information was going on. All of this activity was going on. Officer Stalin, Officer Finkley knew about the violent behavior, was thought to have possessed a gun, was observed by officers who reported to dispatchers were following the guy with the gun. Um, when they got there, they had information which suggested to them that the gun was either on his person or hidden somewhere on the rooftop within reach. And so one of the other officers tell him that Smith didn't have a gun in his hands. The words that the words that he used was he we didn't see anything in his hands, but he was hiding behind the air Officer Stalin, Officer Finkley, the impression that while it might not have been in his hands, it certainly could be still somewhere on that rooftop or hidden on his person in his clothing. And would you agree that if Mr Smith were going to lay down to surrender by by laying down on the rooftop that it would not have been reasonable to shoot him? Well, if the officers knew that and if that had been the command, but that was not the command. Given this highly rapidly evolving set of circumstances, would he have had to have had a command to lay down on the ground in order? What if he believed that just laying down would be the best way to surrender as opposed to standing there and throwing up his arms? Well, for at least a couple of minutes, he had been commanded to surrender both by the initial responding officers and by Officer Stahl. He did not abide by or when Officer Stahl gave him the last command, it was put your hands in the air and turn around. And at that time, he was facing Officer Finkley. But would he have to follow that precise command in order to be reasonable not to shoot him? So if you look at that video, if you watch the video, which I did, and if a reasonable fact finder thought that he was going to make the shooting unreasonable? I don't think that's the appropriate standard, though. The standard here is what a reasonable officer, a similarly trained officer and experienced officer in like or similar circumstances have concluded, like Officer Stahl and Officer Finkley, that this person was not abiding by their orders and was instead presenting an imminent risk to their safety. I think that's what happened. You know, that argument rests on a version of the facts that does not appear to have been accepted by the district court. And isn't that the problem that the city has with regard to qualified immunity? With regard to the facts that were expounded by the district court, the district court created some kind of ipsy-dixit in reading or looking at the video as to what was going on in the officer's heads and thinking that the jury would be determining what was going on inside their heads or their thought process in deciding this. But this is an objectively reasonable standard that should be applied here. And in this particular case, opposing counsel, the plaintiff's counsel, did not dispute the officer's description of what they observed, what they knew when they got on top of this rooftop and the conclusions they reached from the information that was presented to them in this set of circumstances. With regard to that, with regard to that factual circumstance, was there ever any kind of consensus, either in the district court or among the parties, as to when the phone, where the phone was as Mr. Smith raises his hands and then drops his hands, and how the phone then fell out? Was it in his left hand? Was it in a pocket? Is there any consensus on that? There wasn't any kind of consensus regarding that. Because at the time that Officer Stahl made the decision to fire his weapon, he could not clearly see the hands. There had been movement towards Officer Finkley. You know, Officer Stahl had told him, put your hands in the air and turn around. He did not do that. The hands never got up further than maybe the waist, as is clear from the record. And I don't think anybody, even the district court, disagreed with this. You know, Mr. Smith is a dark-skinned man. He was wearing dark clothing. There was a dark shadow behind him. And so in that literally instant when Officer Stahl hears the shot, he cannot clearly see those hands and doesn't know if Mr. Smith had retrieved a weapon from his pocket in this motion that was being made towards Officer Finkley. Is there evidence that Mr. Smith was being told by the officers who were on the ground, not on the rooftop, to lay on the ground? No. In looking and listening to the body camera videos of Officer Stahl as he's approaching, they asked him to lay down. I think the initial, there might have been in one of the initial officers telling him to submit and lay down or come. But I think they're more of their commands were, my memory is, that they were telling him to come here, come over here, come by us, put your hands in the air, that type of thing. But here, clearly, Officer Stahl said, you know, put your hands in the air and turn around. That was not done. And rather, there was this fluid motion, hands going down, hands going forward, going down towards the air conditioning unit that was between Mr. Smith and Officer Finkley. Officer Finkley could not see through the air conditioning unit and give it all the information that was presented to him. And what had happened in that eight seconds, from when he steps on the roof to when he fires the first shot, he made a very quick decision that there was an imminent threat posed by that movement and determined to fire his weapon to protect not only himself and Officer Stahl, but the other officers and citizens who were in the area. And so I think that given those facts, those undisputed facts that a plaintiff did not dispute, and even given the court's decision, if you take out the concept about having a jury decide what was going in the officer's head, which is not the appropriate standard, if you look at this from the objectively reasonable perspective, it's all about given what, indisputably, the officers saw what they knew was unreasonable for them to fire their weapons and their position that it was not. And even aside from that, that the case law was not so clear as to direct them or indicate to them that their decisions to shoot were, in those instances, something that would violate Mr. Smith's constitutional rights. And I see with the timer, there's 53 seconds. I think that's of my total 10 minutes. I'd like it. I'd like to reserve some time for rebuttal. Thank you. Thank you, Mr Stern. Yes, thank you, Your Honors. I think there, uh, there's a few things here. Number one, uh, Mr Smith was an unarmed man. Number two, nothing was done or said to threaten the officers with a gun or any other weapon. Thirdly, uh, his hands were open to view. Fourthly, there was the, uh, air. Uh, and it was a considerable distance, uh, from him. Uh, fifthly, you could see his hands. You look at the video. I think that's a telling video because it was not a threat, uh, or probable cause to believe that there was a physical threat to the officers. Uh, there was no evidence that it was anything other than unarmed. That's not true, Mr. Stern. The evidence is that the officers were advised, um, and had information that he was armed. And, um, the fact that they didn't see, um, his hands to confirm whether or not he was armed, except for that fraction of a second. It's really like a second and a half on the videotape that he, um, gestures with his hands and then reaches downward. Um, that, that, um, is confirming evidence that he might be reaching for a they were told he had either on his person or perhaps had hidden behind the air conditioning unit that effective is not. It's not 20 hindsight based on what we now know that he was not armed, but based on what information the officers had going up onto the roof into this dangerous standoff, they were told he was armed, but that it was not that the other officers did not see the gun in his hand. So it could have been in his pocket. It could have been on the roof behind the air conditioner where he was hiding. And so we judged this from the viewpoint of a reasonable officer in possession of all of that information, not because the officers didn't know he was unarmed. A reasonable officer with eight seconds made a calculus that, in our view, was not reasonable. Uh, his hands were observed. There was a cell phone that was observed. Clearly, they there was no sudden thrusts or it's not. That's what he was reaching down to the ground. The video clearly depicts that. Yes, he was reaching for the ground as if the question is whether whether a reasonable officer in possession of the facts that I just outlined in that fraction of a second, uh, whether it would be reasonable to conclude that he was reaching for a gun while he was told the officers were told by Officer Farrell, Robert Farrell, that he didn't have a gun, that he didn't have a gun in his hand. The officer said that's right hand. So the proper question here and where the district judge applied the wrong standard, the judge said, Well, there's a jury question about whether this was reasonable or not. That's not the right standard for in the circumstances that these officers were confronting. I could believe that he was reaching for a gun. No reasonable officer. Have you never seen a gun? Having Officer Wenzel never seen a gun? Um, uh, but these officers think they never saw that this was an armed man. That was just and that's what the call was that they were responding to. And so that's the information that was extant at the time. But the information was never confirmed whatsoever. And if we look at the test, uh, all they knew is that someone had arms and that there was a fight over a girl and that my client, uh, was hit and beaten up by the people involved. And after that point, uh, think we install? No, absolutely. We're doing an armed man. But there was nothing to demonstrate to a reasonable officer that he was on. And that's what the district court said, that there was no evidence that this man was armed. And it took eight seconds. That's that's a millisecond. And I'm looking at it from the position of the officer forward, not in hindsight, not 2020. I'm looking at it as if it occurs as it's evolving. And there was no evidence of arms. There was no evidence he had an arm. He had any arms behind the, uh, and I think that they should have taken, uh, some opportunity since they didn't see it on and looking at some of the cases in every case that was cited by the athlete, there was actually a weapon. There was something seen something visible, a bat or a club or a knife or a we don't have that here. Unfortunately, for the defendants, we don't have the visual visuality that a reasonable officer would have have fired the shots using deadly force, which it was, uh, to fire at this gentleman. And that's our position. And that was the district court's position based on the fact there was never a gun. There was never a gun found. There was never a gun seen, and there was never a gun handled by Mr Smith. Anything further? Nothing further. Judge. Thank you. It's Latin. Very briefly. But you know, this concept of there needing to be a gun in a person's hand raised and aimed at an officer in order for the officer to be justified using deadly force is not correct. I think the case last cited in a briefing amply supports the concept that as long as there is an imminent threat and if there's a reasonable conclusion that there's an imminent threat here, an officer can use deadly force. In the cases we see, officers have been found to act reasonably when they fire at cars that are driving away from them, when they see somebody simply reaching for a weapon or when they're using verbiage that suggests gun related thoughts and threats. So I think the thought that or the idea or concept that a gun in the hand is necessary in order for an officer to be justified in shooting somebody is completely misplaced. But given the totality of circumstances, I believe that these officers are entitled to be protected by qualified immunity. Thank you. All right. Thank you very much. Our thanks to both counsel. The case is taken under his mind.